Good afternoon, your honors. I am David Doughton and along with John Parker, representing Mr. Scott. We would request to reserve five minutes for rebuttal at this time. That's fine and you may proceed. Thank you. This afternoon, I would like to address mainly the course of conduct, the vagueness, the Maynard Godfrey issue. Given time, I'd also like to address the ineffective assistance of penalty phase. To begin with, and I'm sure the court's aware, that in this case, Ohio, at the time of Mr. Scott's case, indicted him with a course of conduct for one of the victims. And the course of conduct at the time was defined as that the homicides were part of a course of conduct involving the purposeful killing of two or more persons. The vague concept here, which was objected to at the time and which we're arguing now, is what the term course of conduct, what does this mean? And obviously, in looking at the briefs, the issue is whether there is a plain meaning that the jury could apply according to Tuliopa or whether it's a Godfrey violation. This is a type of case where a juror with normal sensibilities might interpret it completely different. Where exactly in the trial court record did Scott object to this aggravating circumstance on vagueness grounds? I see a sufficiency objection based on the record there. There was an objection. He did not state the reasons for the objection. There was an objection. In this case, the trial judge obviously was aware. There was no definition under the Ohio jury instructions as to what course of conduct meant. The judge, having no guidance, created his own instruction. And there was an objection, and there's no reason for the objection, but I think it's apparent from the context and from the further arguments that, in fact, the instruction given by the judge, frankly, made things more vague and, I guess, made it less compliant, if that could be. Would you agree that the argument you're making now was not presented to the Ohio courts? It was not presented on direct appeal. It was presented in the application. That's where you're going to go with this? Yes. 26B? That's correct. Okay. I think in the Supreme Court it's another number, but yes. Yeah. And it was timely filed, and the Supreme Court denied it, not on a procedural default. There was a one-page denial saying denied, period, without any explanation whatsoever. That was my question, so proceed. Thank you. We're all just writing. That's fine. In the problem in this case, again, it became apparent. We understand that the Supreme Court has indicated that even if the statute is vague, it can be corrected either with a jury instruction or by the appellate courts. That's clear. It's not disputed. In this case, the Ohio courts did not do that. In Scott itself, direct appeal lawyer argued sufficiency, saying, look, it's insufficient because there's no course of conduct here. It's two separate homicides. Direct appeal did not directly address the Godfrey-Maynard issue. That was done, as we just established, on the Birmingham. However, dissent indicated, look, we've got to define this. It's hard to know what to raise. We've got to define this. I urged the court to do it, and the dissent argued that it was vague. The very next case after this in State v. SAP, Ohio v. SAP, they did define it because the court then became aware of the problems. What is interesting about it, the SAP definition is not even close to what the trial court did in Scott's case itself. Isn't all that, frankly, just irrelevant to the issue for us? Kind of. Let's say it was already constitutionally clear. They could have just made it more clear. The fact that they made it more clear doesn't mean that it was unconstitutionally unclear, right? Yes, except for on direct appeal, because it wasn't raised in direct, they didn't address the issue. Right. And in no other case before that had they addressed the issue. So we have a case where the issue then becomes with, one, is this plain meaning? Is coercion conduct the type of plain meaning case? Or was the instruction given by the trial court sufficient to give jury notice that the class of people are narrow? Why don't we start, I guess, with the question of whether and how you presented this to the Ohio courts? I mean, I understand you want to argue that it was presented by means of your application to reopen his direct appeal. Correct. Those are, as I understand it, those are ineffective assistance to counsel claims. That's correct. So why don't you explain how it is that an attempt to assert an ineffective assistance claim presents the merits of an Eighth Amendment vagueness claim? Well, my understanding was that it was raised both ways in the petition. And this court didn't raise the substantive issue, just the ineffective assistance, or excuse me, didn't raise the ineffective assistance of appellate issue, it just raised the substantive issue on direct appeal. The only way this could have been raised in the Ohio courts is after it wasn't raised in direct appeal, would have been in the 26B, if you will. That's the only place it could have been raised. But again, I just, I mean, am I mistaken, and I'm sure Mr. Dattin, you know better than I, I mean, am I mistaken in thinking that this 26B, if I'm getting the number right, that that's just a means for presenting ineffective assistance claims? That's correct. Ineffective assistance of appellate claim was raised in the petition, in the original petition, in federal court. But if you had not otherwise presented this Eighth Amendment vagueness claim to the Ohio courts, what I'm having trouble seeing is how your attempt to present an ineffective assistance claim through 26B amounts to asserting the Eighth Amendment vagueness claim. Am I being clear? You are being clear. And my response to that is the way this is, again, because it's the only opportunity to raise that in Ohio, had it been granted and reopened, then the issue substantively could have been addressed to the Ohio Supreme Court. But it wasn't. But it wasn't. It's a problem you have. It is a problem we have. I would completely acknowledge that. Okay. I'm just, I'm trying to figure out how you solve it. I mean, you had, it's not like you never had an opportunity, not you personally, but Mr. Scott never had an opportunity to present this. He did. He just didn't do it. There's this sort of last chance procedure, but it's for a different kind of claim. And in any event, they didn't reopen it. So it would seem that this claim, in fact, was not presented to the Ohio courts. And I just, I want to give you a chance to explain why that's wrong, if it is. Well, I guess kind of the point. Adjudicate it. How about, let's put it that way, you know, adjudicate it. I understand the point. We did discuss this. And the problem we had, very frankly, was this court granted the ineffective, or excuse me, the direct claim, but didn't grant the ineffective appellate claim. And, frankly, this would have been, I guess we would have liked to have had the ineffective appellate claim because that's really the only way concededly we can get that before this court. It is my experience that, substantively, the issue, well, the dissent did address it with the court, but the majority did not in the Ohio Supreme Court. And if we have a situation where, basically, there was an impossibility to do it because when they did not accept the Murnihan, there was no other grounds to raise it, it was raised in federal court. And, you know, frankly, I think Moppin applies because it's essentially a default issue, and we would argue that the cause of the default was the appellate ineffectiveness and, obviously, the prejudices, if this court agrees it was vague. Okay. Well, I've exhausted my question. No, I understand. But I guess the way to put this in context, outside of the procedural default issue, is if in Godfrey, in Godfrey, as the court knows, you know, that was the classic vile, wanton, cruelty issue. And what Godfrey both said is, look, the appellate courts in the state court never attempted to narrow it. They did a fact-based analysis saying, you know, basically, we don't know what this is, but clearly this fits this issue. If in this case, instead of course of conduct, or excuse me, in Godfrey, if they would have said two or more killings committed in an atrocious, heinous manner, it would have still had the same problems if that element of the specification weren't addressed, if it weren't narrowed specifically. That's the same thing that we have here. Because the only attempt in the state courts to address the vagueness was the trial court, where they, you know, indicated that this is a path of criminal behavior, but didn't limit it to the, you know, the homicides themselves. And they said path of behavior. And the problem with path of behavior, it opens up everything. You know, there's no narrowing at all. To each juror, path of behavior doesn't even have to be criminal behavior, doesn't have to be limited. And they said in the instruction, doesn't have to be limited to any particular time, doesn't have to be limited to any particular space. That was the narrowing done in Scott's case itself. And it's really just a literally synonymous term. Coarse path, pretty synonymous, you know, of conduct behavior. It is. But when the trial court then went on to define it further. Right. It said it doesn't have to be at the same time. Right. There was no time limitations. There wasn't even a limitation of the type of conduct. I mean, let's say we have a different case involving a serial killer. Right. Who, you know, kills seven victims over a five-year period and has a particular, you know, M.O. or something. Right. That, it wouldn't be unconstitutional to say that would fit within it. Well. I mean, it's not like we have to have, you know, some kind of time limit on the course of conduct. No, it doesn't require, but you have to understand what it encompasses. And it's interesting, your signature crime, if you will, serial killer case. Ohio now defines it that would cover that. You know, there's a psychological connection. There is a signature type of killing, if you will, that the underlying felonies are similar. And I think what they use in the SAP case is, you know, sex offense, rapes. So in that case, it is defined. And granted, the Supreme Court doesn't require a great deal of specificity, but there's got to be some. In this case, course of conduct to different jurors could mean different things. And it's interesting, in the dissent in Scott, the dissenting justice points out that, look, if it's just two killings, it doesn't fit within the statute, which was why the sufficiency argued in the first place. So, you know, I mean, frankly, that plays it out as best as I can lay it out in this situation. It's just the fact that because different jurors of different sensibilities could interpret that in entirely different ways and include a lifestyle, in this case, Mr. Scott was, you know, testimony came out that Mr. Scott had threatened witnesses. Again, that's not a specification. And it's important to note that in Ohio, the nature and circumstances of a case cannot be used in aggravation. It can only be used in mitigation. And so such a broad definition, of course, of conduct or path of behavior would allow the jury to consider all those because it did not limit it to the homicides. It said path of criminal behavior, and there was no limitation whatsoever. I wonder if we could move for the moment to the ineffective assistance of counsel claim. I guess I'd like to hear your best argument here. Given, you know, the large number of mitigation that was put on, 13 witnesses, family members, social workers, friends, just wondering what you find to be the most compelling argument, that there was a deficiency and that there's prejudice. Sure. I have to, and we stated in our brief that compared to most arguments that we're making before this court, the amount that the trial lawyer had done was, frankly, more than a lot. But here's the problem. This is square with Rompia in that the fact that you investigate an aspect or multiple aspects doesn't mean that you've done your job or you've been effective. Clearly, Wiggins requires that you investigate all opportunities and every avenue. In this case, the failure to investigate, the theory of the case for the prosecutor's case in mitigation and their argument was, look, we don't dispute that Mr. Scott had a tough childhood. We don't dispute that he wasn't beaten. We don't dispute that he wasn't taken away. His mother didn't care. But then after he was taken away, he was put in with another older woman, Ms. Wilson, who treated them nicely, and then he had a chance to be with his brothers and stay with a religious family that was a great family and portrayed it as, frankly, it didn't say this, but we're in Ozzie and Harriet. It was a great world, and the defendant didn't take advantage of it. He had every opportunity, because he went to the Scott family, and he had every opportunity to take advantage of it to change his life around, and he didn't do so, which made it almost, it's a proper argument, but it really was almost an aggravator in that, look, you can't give any weight to all this good mitigating evidence because he had plenty of time. From the time he was essentially 10 until he was 18 and left the Scotts, he had model people taken care of, and that simply wasn't true. In fact, in doing the full argument, found out that he had been beaten by the Scotts on numerous occasions, that there was mental cruelty and that there would be times where he missed the Mrs. Wilson he used to when they'd take him by and have him look in the window. The Scotts actually had a name for their belts and called it, I think, Mrs. and Mrs. Brown because of the beatings. When you look at all that type of cruelty and continued abuse, where he was taken out of one place and then had some stability, but because of age, he was taken out and put into another indication, he walked out the door when he was 18, the minute he was 18. In fact, he did stay with the family a considerable amount of time. He really didn't bond with his brothers and sisters. There's an affidavit from a person who had been with the Scotts that indicated that she tried to stop him from being placed with the Scotts because of what had happened and wasn't able to do so. This is an entirely different presentation to the jury in that, look, when you're measuring the mitigation, understand that he was given this six or seven year period to change his life around where he had model parentage and he failed to take advantage of it. It's a much different case when he was put back into the same situation that he'd been originally raised with and he didn't give the nurturing. There's indications that when the Scotts went to church, for instance, that they placed dogs on either side of the foster kids there because they didn't want them to go anywhere and it was frightening. They had indication that the biological children were treated much differently than the foster children were, Michael and his brother, so that this turns on a whole different on why he left, on why he didn't, quote, take advantage of the situation, and what caused him to frankly give up, if you will, on down the track. And that's huge because a major argument of the prosecutor was the fact that we did everything for him and he didn't take advantage of it. And that is not a mere cumulative issue. It's not just like in Van Hook, distant relatives that are brought in to do double hearsay. The affidavits were from people who actually experienced and actually saw it and presented an entire different light of between, I think, 11 years old and 18, what he was going through. And because of that, I think there's more than a reasonable probability that they would have come back with a life had they understood the full mitigation in this case. Again, because you do 60% or 70% of it as an ABA model properly, but then you fail, and clearly the Scots were a key aspect to his life all through adolescence, that's the issue. That's what it comes down to. This claim was adjudicated, if I recall correctly, by the Ohio courts. So it is subject to edpidepherence, right? Correct. So, I mean, what you're asking us to hold is that no reasonable jurist could find that the omission of this testimony, which, as I understand it, concerned primarily corporal punishment, favorable treatment for the biological kids, and sort of forcing them into the religious practices. Kind of mental cruelty, right? That no reasonable jurist could find that that testimony would not have caused the jury to bring back a life sentence instead of death. I'm not sure that's the standard. You know, I thought the standard under Strickland and Wiggins was that it was a reasonable probability. Right. Different outcome. As the saying goes, there's double deference here. It's an edpid case. Right. The question is, you know, could no reasonable jurist, or something to that effect, disagree? Yes, that it was reliable. Yes. I would argue that no reasonable jurist, I hope I'm not offending anybody, would find that this was a reliable sentencing hearing under the 8th and 14th amendments. I mean, you know, no reasonable jurist could agree with the Ohio court that this omission did not change the result. Well, I will get to that. It's a tall... But here's the problem. The Ohio court that addressed this, it's interesting, because one of the reasons that they came to the conclusion they did was based on their conclusion that if it was important to Scott, that Scott could have mentioned it in the unsworn statement. And that was part of their basis for finding or for denying this issue. That brings us to the second part of the IAC penalty in that the lawyer in the Ohio Supreme Court found this, did not instruct him, told him basically you can't do an unsworn statement for these reasons. So we have this circular basis for the last court on the merits was the appellate court. We have this circular basis for denying it, and it couldn't have been, we're not going to give weight to these affidavits. And what's interesting about that is under pinholster to the defense on this side, it was not rebutted. None of these affidavits were rebutted by the prosecution during the post-conviction. When it gets so that they're unrebutted, we get to the court of appeals. They basically say, you know, we're not, it can't have been that important, or we're not giving it the credibility we should because had this really been important, Scott could have got up in his unsworn statement and testified, look, what was on a trial was all different. But he was told by his lawyer essentially don't do it. So we have this circular argument that's the merits review of the court of appeals of saying we're not giving it credibility because he didn't testify after the Supreme Court had said, look, it was wrong, you didn't show the prejudice, but it was wrong for the lawyer to improperly instruct on the unsworn statement. Well, the prejudice is clearly what happened on post-conviction, that the post-conviction was denied the credence it should get by the appellate court because he didn't take his opportunity to make an unsworn statement and make all this stuff known. So that's why the decision in the post-conviction court is unreasonable. And so that's why I think it is preserved, and we are here. And yes, I think that no reasonable jurist could find that the sentencing decision in Scott's case was reasonable or was reliable. This lawyer certainly did a lot more than lawyers in other capital cases... Unquestionably. ...that have been tagged with ineffective assistance for failure to investigate. Unquestionably. But again, it's the issue in this court found in Dickerson, for example. Because in Freddie Dickerson's case, what happened was the lawyer thought that this was a strong mental health case. So that they did everything based on the mental health amount, and he neglected part of the background. Because in the lawyer's opinion, it wasn't as important and thought he could win on the mental health. The lawyer did a nice job otherwise. This court found, and I think it's totally consistent with Wiggins, that no, you can't make a strategic decision on what to present or how to present in mitigation unless you've done all the investigation on all aspects, on all reasonable aspects. And by not investigating, it allowed the prosecutor to effectively rebut the good mitigation was presented by basically saying Michael didn't take advantage. And that's the problem. Mr. Scott claims that Ohio's method of mitigation violation violates the Eighth Amendment. Yes. Has he joined the litigation that's going forward now? In fact, Mr. Parker and myself represent him in that litigation. That's the protocol litigation before Judge Frost? That's correct. Okay. And we were kind of joking with ourselves that we're under protective order, and I'm not sure I'm happy telling the court I can't tell you what's going on in the U.S. Well, that's the only question I have. But the answer is yes. Isn't that the proper forum to resolve that issue? But they're two separate issues. Theoretically, in the 1983 action, what the plaintiffs are doing is saying the protocol as it's now established is a violation of either due process or cruel and unusual for various reasons. It's so fluid. But we can't ask Judge Frost to end lethal injection. That's not an option. Basically, our position under 1983 is that here's what's wrong with the protocol, here's why we believe it's constitutionally the protocol, but it's stopped short of saying you can't do lethal injection. That's not an option Judge Frost has. The only place we can argue that the protocol causes lethal injection to be unconstitutional is habeas. That's the situation. Our situation, and I'm glad the court brought this up, is that it was not developed in state court. The warden is correct, but the reason is in Scott's case, the court remembers the district court remanded Scott back to the Supreme Court of Ohio with the question could it have been litigated in Ohio, and the Supreme Court of Ohio said no. The Supreme Court of Ohio in this case said there is no place in Ohio, there's nothing under the legislature or this court that you can litigate lethal injection, which leaves it to the federal courts alone. That's all you can do it. So because the protocol changes constantly, I'm sure it's going to change again, so it's this fluid position that we're in where we're trying to catch a greased pig and saying, present to you, well, this is unconstitutional because, but we don't know what that is. There are a number of cases the courts are aware of. I hate to interrupt you here. I'm sorry. So what's your question today, that it violates the Eighth Amendment because it is fluid? No. Is that the issue before us? Well, very frankly, the AG is right in the fact that we don't have the facts to present to you, and what we're asking based on this is it be remanded and made part of the discovery with the other lethal injection cases. Okay, but why doesn't your involvement into the 1983 case give you that remedy? Why do you need a separate remand in this case? Because, again, if I understand this correctly, the 1983 action cannot result in the banning of lethal injection, as opposed to a habeas where it could conceive. Categorically, you're talking about? That's my understanding, and if I'm wrong, I'll be corrected,  You want to just keep that issue alive. Correct. Even though it can't rule because it's premature. Which is why we would request for that one to be remanded back with the other cases, the O'Dray, Jones, and Adams, and those cases which are waiting. All right. Sorry, I'm out of time. Thank you very much. You'll have your full rebuttal. Thank you. Good afternoon, and may it please the Court. I'd like to begin with Scott's first assignment of error related to Ohio's course of conduct aggravating circumstance, specifically with the fact that Scott has procedurally defaulted that claim by failing to fairly present it to the state courts. He acknowledges in his opening brief at page 32 that he failed to present this claim on direct review, and under Ohio law, that was the only time that Scott was able to bring that claim. Under the Ohio Supreme Court's precedent in State v. Perry, the Court held that post-conviction petitioners cannot bring their claims in post-conviction if they fail to bring them in direct review where those claims were based on the record. And Scott's course of conduct aggravating circumstance claim is based on the record and should have been brought in direct review. Now he points to his Murnahan petition and says that by raising it in his Murnahan petition, he's exhausted the claim that he now presents to this Court. But the Murnahan petition is a procedure under Ohio state law that allows a petitioner to reopen an appeal on the basis of ineffective assistance of appellate counsel. That's the argument that Scott presented to the state court in his Murnahan petition, and that's different than the argument that he presents to this court. And the U.S. Supreme Court in Picard v. Connor has explained what it means to fairly present a claim to the state courts, and it must be the same claim on the same facts and law that he then produces in federal habeas petition. And that's what Scott has failed to do here. The claim that he presented to the state court and that he relies on was a Sixth Amendment claim about ineffective assistance of counsel, and the claim he presents today is under the Eighth Amendment. So is the way that rule works is that if the petitioner demonstrates ineffective assistance of appellate counsel, that's not itself a basis of relief, but it allows the petitioner then to assert additional claims for purposes of direct review? That's correct. Under Ohio law, if he had prevailed in his Murnahan petition, which he did not, the Ohio Supreme Court rejected that in a one-line order, but nevertheless a merits adjudication. After rejecting that, then he was unable to reopen his direct appeal. But had he prevailed, the remedy would have been reopening his direct appeal. This is a very similar circumstance, in fact, an identical circumstance to what this court faced in the case of Lott v. Coyle. In that case, the petitioner attempted to rely on a Murnahan petition in order to raise a claim on the merits in federal habeas review, and the court rejected that attempt. And if there's any doubt that the two claims are different, one need look no further than Scott's own habeas petition, in which he presented both the Eighth Amendment claim on the merits that he's bringing today and the Sixth Amendment ineffective Assistance of Appellate Counsel claim, but he presented them under different headings with different factual and legal analyses, because those claims are different. And if the court were to disagree with the procedural default analysis and to proceed to the merits, EDPA would apply to the claim because I assume that the court would have adopted Scott's argument regarding the Murnahan petition, which means he presented it to the state court. The state court rejected it on the merits, so EDPA would apply. And he simply failed to show any U.S. Supreme Court precedent that the Ohio Supreme Court unreasonably applied when it decided his course-of-conduct aggravating circumstances claim. That would be the Godfrey and Maynard cases. Those are the only times that the U.S. Supreme Court has rejected a state's aggravating circumstance, and notably, as the court laid out in Tulipa, those two cases are very similar to one another. They were open-ended, vague examples of what conduct would have constituted the aggravating circumstance. They were things like heinous, atrocious, and cruel in the case of Maynard, and in Godfrey, it was wantonly vile, horrible, or inhuman. That's absolutely dissimilar from what we have here, because Ohio's course-of-conduct aggravator absolutely narrows the number of murders that are eligible for the death penalty. That's because it's a multiple-murder aggravator. The individual has to have committed or attempted to commit one or two or more murders. And once there are two murders, that's already narrowed the field of eligible murders. There's simply no U.S. Supreme Court precedent dealing with an aggravator like this one that narrows first, and then, arguably, if you adopt the petitioner's argument, could be vague subsequently, because there's no U.S. Supreme Court precedent on point, and AEDPA applies the Ohio Supreme Court's ruling, doesn't violate clearly established law. Moving on to the petitioner's ineffective assistance of counsel claims, he first alleges that his defense counsel was ineffective at the mitigation stage. AEDPA does apply to this claim, and it's simply not the case that his defense counsel was ineffective. As has already been noted here today, defense counsel presented 13 mitigation witnesses, five of them addressed the relevant time period in Scott's life, the time that he spent with his adoptive family. One of those was a mitigation specialist hired by defense counsel to investigate, to look through child welfare records, and interview family members and other people who knew Michael Scott. The other four were family members, Mr. and Mrs. Scott themselves, Scott's biological younger brother, and an adoptive sister, and all of them painted a picture of a functional, not necessarily perfect, but a functional family life. In post-conviction review in state court, Scott presented three affidavits that he says alleged that the Scott family was abusive. The worst of those affidavits in terms of what it alleges is Eric Calloway's affidavit. It does allege things that, if true, would most likely constitute abuse, the types of things that opposing counsel was here talking about today. However, first, it wasn't ineffective for counsel to fail to find that affidavit. The Scotts had fostered more than 100 foster children, and it's simply unfeasible for defense counsel to interview all of them, to find all of them. Also, the Calloway affidavit is not dated, so there's no indication that he was in the Scott household at the same time as Michael Scott. In fact, it's likely that he wasn't, because the Scotts stopped fostering children and adopted the children currently in their care. That was how they came to adopt Michael Scott. And Eric Calloway was a foster child, most likely at a previous time. Additionally, the other two affidavits were from individuals who defense counsel did interview and who did testify at mitigation. Their names were Lisa Hall and Patrice Turner. Patrice Turner indicated some evidence that might be considered abusive, but she also lived in the Scott household at a time far earlier and not at the same time as Michael Scott. She didn't witness any abuse to Michael Scott, and she said in her affidavit that she had told defense counsel this information when it's disappointed they didn't use it. That means that defense counsel was aware of that information. Then there's also the Lisa Hall affidavit, and it simply does not allege abusive conduct at all. She indicates that Scott didn't like going to the Scott household. That was primarily on the basis of her affidavit, because he had enjoyed the Wilson household where he'd previously lived and had to be moved. And she indicates that the Scott household didn't celebrate holidays like other families did, and that was because of their religion. In any event, if it was deficient performance for counsel not to have presented this type of evidence to the state courts, it was not prejudicial to Michael Scott. There was far worse evidence in front of the jury about truly horrific child abuse in his early life, and that information didn't sway the jury. And additionally, the prosecution could have impeached this story if Scott's counsel had decided to tell it. For example, there were extensive records from child services indicating that the Scott family was a truly generous family. They'd hosted more than 100 foster children. Prosecution could have pointed to those records. And perhaps most importantly, the four Scott family members who did testify were the only individuals who testified that they loved Michael Scott and that they wished that the jury would spare his life. And if Scott's defense counsel had chosen to paint an abusive portrait of that family, he likely would have lost the benefit of that testimony. Moving on to the ineffective assistance of counsel claim as regards to the unsworn statement, EDPA also applies to this claim. But although the Ohio courts found that counsel erred in the instructions that they provided to Michael Scott, that simply wasn't prejudicial. Some of the reasons are similar to what we just spoke about, which is that, well, first would be an additional reason that we don't know what Scott would have testified to. We don't have an affidavit. We don't know that he would have testified even if he'd had the correct information. We don't know what he would have said, and we don't know if he actually did witness or sustain the type of abuse that's in the Callaway affidavit. But even if he had testified to it, again, the jury had evidence of far more extensive abuse in front of them. The prosecution still could have impeached the story, could have called Mr. and Mrs. Scott themselves, could have referred to the child welfare records, and it also would have appeared to contradict the loving testimony that the Scott family members provided. On the third issue, I'll address it only very briefly. It's a merger issue about the kidnapping and aggravated robbery charges or aggravating circumstances that were also charged and of which Michael Scott was convicted. AEDPA applies to this claim, and he's shown absolutely no U.S. Supreme Court precedent that would contradict the holding of the Ohio Supreme Court. His claim sounds entirely in state law, which, although it's not relevant here, is an accurate claim and consistent with Ohio state law that the Ohio Supreme Court has held there must be separate animus in order to charge both kidnapping and aggravated robbery, and here there was separate animus. Michael Scott kept Ryan Stauffer in the car for an hour and a half on a test drive that should have taken far less time, and by his own admission, Stauffer began to understand that something was wrong and gave directions to return to his grandmother's house on multiple occasions, but Scott directed his friend, who was driving the car, to proceed. That's a separate animus for kidnapping that wouldn't have to be present in order for aggravated burglary, so both of those claims were accurate. They didn't need to be merged, and there was no error of state law. The only Supreme Court cases that he relies on are cases about weighing aggravators in which one of them has already been found to be improper, either by a state court under state law or by a federal court on habeas review, and that's simply not the case here. And finally, turning to the lethal injection claim, Scott should bring this claim under 1983 as I understand the claim that he's raised in his briefs. It is a protocol-specific claim that belongs in the protocol litigation, although this court has held that some claims about the lethal injection method are cognizable on habeas review. This isn't that type of claim. The only case that he cites is Vase v. Reese, which was a civil claim, not a habeas claim. He seems to be bringing his challenge in that way, and if so, it belongs in Section 1983 litigation. To the extent that his claim is one that would render the death sentence effectively invalid, which is a standard this court used in Adams v. Bradshaw, that claim is one that he did present to the state courts, and they found it procedurally defaulted. That's the fifth. What technically would you have us do with the protocol claim here? My first preference, or at least as I understand the claim that he's made, would be to call it a protocol-specific claim that belongs in Section 1983. But alternatively, I think dismiss it because it's not cognizable on habeas review. He's making a claim that's about the conditions of his confinement rather than a claim about his sentence, and if his protocol-specific claim is only about the protocol, that's not something that would be cognizable on habeas review. Well, his counsel says that under the 1983 claim, that a ruling that it is cruel and unusual after the protocol is litigated cannot be made. Is that correct or not? I believe counsel discussed an Ohio Supreme Court opinion that discusses what types of forms might be available to raise this claim under Ohio state law. The meaning of that opinion is somewhat disputed, but I think it's clear from the face of it that the court was only addressing various post-conviction procedures and held that there was no lethal injection-specific Ohio procedure in which a defendant could bring that type of claim. But the court also discussed all of the other options that are available to the defendant on direct review, and that's what happened in this case. Scott brought his claim to the 5th District in a post-conviction petition, and they said that his challenge to the constitutionality of lethal injection broadly belonged in direct review. He'd failed to raise it in direct review, and so he defaulted that claim. That's an independent and adequate state ground for procedural defaults. It would mean he couldn't bring it here in his habeas petition. Okay, but he's arguing that the new protocol is of 8th Amendment violation, and the new protocol wasn't even in effect when the prior appeals were. It's pretty hard to say that he's procedurally defaulted on something that didn't exist. That's correct. So it seems to me that he should have a complete remedy as to this new protocol that just went into effect, including he ought to be able to challenge whatever it is that it's cruel and unusual. That's correct, and that type of challenge is exactly what belongs in Section 1983 litigation. And that's the kind of relief they can give. Absolutely, that's the kind of relief they can get. Unless there are any further questions, I'd ask that the court deny Scott's petition. Okay. Thank you, Ms. Dilhoff. I want to address first the ineffective penalty and an interesting aspect of the pinholster. What's argued here today was, you know, had they presented this, the prosecutor could have impeached it, they could have done this. But, you know, my understanding of pinholster is what's developed in state court is what you have in the litigation in federal, and you can't develop any more, that's what it is. In this case, the affidavits were presented. It's part of the post-conviction. They weren't rebutted. There was nothing rebutted. It doesn't matter whether somebody came in and showed that the affidavits were untrue. I mean, what matters is, had that testimony come in, would no reasonable jurist conclude that, or would every reasonable jurist say there is a reasonable probability it comes out the other way? I agree. That's absolutely the issue here. And basically because Scott's life from age 11 to 18 was presented in basically a false light, you know, that's the situation. At some point, there's a tipping point. You know, just because there's good mitigation doesn't mean that the failure to present other good mitigation is cumulative or wouldn't have mattered. At some point, because it's a weighing process, that at some point, if you put enough, theoretically, if you put enough mitigation on the weights going to, at some point, be an equipose with the aggravators or outweigh, at which point it's a life sentence. We have a situation where there was, and this is to the favor here, there was significant favorable mitigation presented. How close that was to equipoise, we don't know. However, this additional factor, which when countered with the prosecutor's entire argument and penalty phase, is significant, and again, I do think. Some of this evidence might start then cutting back on the mitigation evidence that was admitted for some of the reasons that Ms. Dilhoff said. I mean, the only four people, apparently, who said they loved him and pleaded for his life were the people, were the Scots, whom now we're going to turn around and say how terrible they were. It would make them look like liars. This isn't an either or. You know, save his life. I disagree with that. Okay. The question is whether, you know, nobody could agree with it. No, you could do both. It's not an either or. Forgive me. No, go ahead. This is an either or situation. They could both love him and beg for his life and have done the acts they are accused of doing. One doesn't negate the other. You know, this isn't a situation. You know, if you're a trial lawyer, it's not always so clear. I try too many of these cases, so I know the decisions. There could be a real concern that, jeez, you know, I mean, I'm going to undermine that plea from those people. But the point is you can't make that decision without doing the investigation. That's the issue. Yeah, no, I understand your argument. The other point that I want to make as far as the lethal injection, I disagree with the Ohio Supreme Court's and Scott. It was raised in part of the argument in Scott that, look, direct appeal, you can't do this because it's fluid. You can't do this in a declaratory judgment. You can't do this. And they basically threw their hands up and said, specifically, that the Ohio ledger has not given us any procedure for a capitally convicted defendant to challenge the protocol in these cases. I mean, that was their conclusion. So that aspect of it can't be procedurally defaulted because it's clear there's no place it could have been raised properly. There were five different theories of where at the time they said it could have been raised. Procedural default was on the plate before Judge Adams, and that's why he asserted because five different ways to raise this issue had been okayed or suggested like they would say, no, you can't raise it in post-conviction. You have to do it in a declaratory judgment. You can't do it in a declaratory. You've got to do it in direct appeal. So that that's what the issue was sent back for for clarification. They basically said, we just simply can't do it. Part of the reason was because, look, we'd have to appoint counsel. You know, what court's going to do it? And they frankly punted to the federal court, to be frank. So that aspect was not procedural defaulted. Thank you very much. Okay. Thank you, Mr. Doughton. Thank you, both counsel, for your arguments today. We really appreciate them. The case will be submitted.